Leonard MIKESH, Appellee,

v.

Corliss PETERS, Appellant.

No. 62000.

Supreme Court of Iowa.

Oct. 17, 1979.

Dennis G. Larson of Strand, Anderson, Raduenz, Larson & Cass, Decorah, for appellant.

James Burns of Miller, Pearson, Gloe & Burns, Decorah, for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, McCORMICK, and LARSON, JJ.

REYNOLDSON, Chief Justice.

This controversy centers around plaintiff Leonard Mikesh's "recreational rights" which he reserved in a deed. Plaintiff sued a successor owner of the land, defendant Corliss Peters, for damages, alleging these rights were lost when defendant "clear-cut" the timber from the land conveyed. Following entry of judgment on a $5500 jury verdict, defendant appeals. We reverse and remand with directions.

In 1963 plaintiff acquired 27½ acres of timbered real estate located in a bend of the Upper Iowa River in Winneshiek County. The following year he conveyed this real estate to his two sons, reserving a life estate. August 14, 1974, plaintiff and his sons quitclaimed the property to Eugene Carolan, a logger. This deed contained the following reservation:

[S]ubject to exclusive recreational rights in the grantor, Leonard Mikesh; said recreational rights are not limited to but do include rights in Leonard Mikesh to hunt, fish, canoe, camp and trap on the premises or directly adjacent thereto. Said recreational rights to be for a period of twelve years from the date of this deed.

The land was described in the conveyance as "timberland." However, plaintiff testified the transaction envisioned that "we sell him [Carolan] the land, and he got to cut the logable trees, and I would retain the recreational rights in it." The evidence disclosed the boundary lines were obscure and plaintiff wanted to avoid "watching" the logging operation to keep it on his own property.

Carolan testified, "He [plaintiff] knew the land was going to be cleared." Carolan logged the 27½ acres as well as approximately 50 additional surrounding acres, removing all trees with diameters greater than 10 to 12 inches at the top end, save some hollow trees. Carolan testified that, "As you drop the big trees, you smash the little trees [or] scar them all up or they die." Plaintiff admitted he left it up to Carolan to determine which trees were to be cut.

In September 1975 Carolan deeded the property to defendant in consideration for defendant's timber on surrounding land which the latter owned. The deed from Carolan to defendant stated the conveyance was "subject to the exclusive recreational rights as set out in a certain Quit Claim Deed recorded in Book 298 of Deeds, on Page 118 of the Winneshiek County Records."

Plaintiff produced evidence that beginning in 1975 defendant bulldozed trees and brush into piles around the 27½ acres, and into a small pond where plaintiff had previously turtled. Apparently plaintiff unsuccessfully sought to stop the bulldozing on one occasion. Defendant testified he bulldozed only brush, stumps and treetops, and that the trees were already gone. When he acquired the property after it was logged "[t]here was no way you could walk

through that timber because they cut every log that was over a foot in diameter . . . ."

Defendant owned the surrounding land. He also bulldozed it after it was logged and planted the whole tract to corn. Photograph exhibits show trees were left standing along the river. There was no evidence defendant had ever denied plaintiff access to the 27½ acres for recreational purposes and his testimony he had offered plaintiff hunting rights on his other land stood undenied. Neither did plaintiff seriously dispute that there was game on the premises, including deer, after it was put into corn.

Defendant's appeal raises several alleged errors. We consider only one which we deem controlling. He asserts trial court should have sustained his motion for directed verdict because, as a matter of law, the reservation of recreational rights did not prevent him from destroying the remaining growth, and therefore there was no compensable damage.

■ I. At the outset appellee argues this ground for directed verdict was not urged below, thus any alleged error was not preserved. *See Miller v. Young*, 168 N.W.2d 45, 50 (Iowa 1969). The issue is very close. However, we hold the allegations of the motion were sufficient when viewed in light of defendant's detailed trial brief, asserting the same grounds, filed the day before trial commenced.

II. We therefore turn our attention to the rights acquired by plaintiff through the quitclaim deed reservation. The petition does not allege the reservation provision was ambiguous; plaintiff's counsel at trial contended it was unambiguous. Neither party cites a decision dealing with "recreational rights." Plaintiff's brief asserts that "the exclusive recreational rights referred to in his deed . . . are similar enough to hunting and fishing rights to fall under the same general classification as hunting and fishing rights." He testified hunting was most important of the recreational rights reserved, and that defendant's actions did not interfere with his canoeing or with his fishing in the river, although he

could no longer fish in a small pond on the premises.

Historically, the weight of authority deemed a grant or easement of hunting or fishing privileges not a mere license but an interest in the real estate in the nature of an incorporeal hereditament. As such it was within the statute of frauds and required a writing for its creation. It was not considered an easement because, in a strict sense, an easement implied the holder took no profit from the soil. It was generally classified as a *profit a prendre* : a right to take a part of the soil or product of the land of another. *See Alford v. Finch*, 155 So.2d 790, 792–93 (Fla. 1963); *St. Helen Shooting Club v. Mogle*, 234 Mich. 60, 65, 207 N.W. 915, 917 (1926); *Hanson v. Fergus Falls National Bank & Trust Co.*, 242 Minn. 498, 502, 65 N.W.2d 857, 860 (1954); *Bland Lake Fishing & Hunting Club v. Fisher*, 311 S.W.2d 710, 715 (Tex.Civ.App. 1958); *Fairbrother v. Adams*, 135 Vt. 428, 430, 378 A.2d 102, 104 (1977); 1 G. Thompson, *Commentaries on the Modern Law of Real Property* § 135, at 511 (repl. ed. 1964).

A *profit a prendre* may be acquired by reservation in a deed of the servient land, *Thompson, supra*, § 140 at 527, and such reservations have been recognized by courts. *See, e. g., Hanson*, 242 Minn. at 507, 65 N.W.2d at 863; *Council v. Sanderlin*, 183 N.C. 253, 111 S.E. 365 (1922). This court in *Baker v. Kenney*, 145 Iowa 638, 642–43, 124 N.W. 901, 903 (1910), although in dicta, acknowledged that the term *profit a prendre* included rights of hunting and fishing, and was a right which could be exercised in gross and acquired by reservation in a deed.

■ Although the parties extensively discuss whether the various facets of the claimed rights should be categorized as easement, covenant, license, or *profit a prendre*, we think it is sufficient to hold an interest relating to the described tract was created which survived the conveyance from Carolan to defendant. Our concern then is to what extent, if any, such a reservation can limit the subsequent activity of the owner on his or her real estate.

A basic rule relating to such grants is that they must be strictly construed and cannot be extended beyond the terms of the instrument itself. *Bland Lake*, 311 S.W.2d at 715. *Thompson, supra*, § 140 at 527 (citing cases). Also applicable here is our long-standing concept that "exceptions and reservations in conveyances are to be construed most strongly against the grantor." *Wiley v. Sirdorus*, 41 Iowa 224, 226 (1875); *see generally* 23 Am.Jur.2d *Deeds* § 273 (1965).

Seeking helpful authority to guide us, we find no recent applicable cases, nor have the parties. We assume this is because in modern practice the grant and the respective duties and rights ordinarily are detailed enough to avoid litigation. But there are several older decisions which reach the issue before us and resolve it against grantees who do not bargain for and obtain restrictions against changes in the servient property.

The decision most on point is *Isherwood v. Salene*, 61 Or. 572, 123 P. 49 (1912). In *Isherwood* the owners of "the sole and exclusive right, privilege and easement, to shoot, take and kill any and all wild duck and other wild fowl upon and in any and all lakes, sloughs and waters situate, lying or being upon [designated] land" sued the landowner to enjoin her from draining certain lakes and sloughs upon her farmland and also from cutting and burning brush and timber bordering the lakes. The Oregon Supreme Court held that plaintiffs "must exercise the right in the condition it may be at the time," *id.* at 575, 123 P. at 50, adding that, "If she [defendant owner of servient estate] is systematically clearing her land, evidencing a bona fide intention to improve it, no complaint can be made against her." *Id.* at 579, 123 P. at 51. As for draining the lakes, the court said, "If they can be, then surely, in the interest of good farming, she should be permitted to do it, and it is not for the court to say whether she can or cannot." *Id.* at 579–80, 123 P. at 52. The court observed it was not justified in implying more than was expressed in the deed. *Id.* at 579, 123 P. at 51. However, the court indicated that "[f]or cutting and burning brush in bad faith, in a manner to injure the hunting, defendant would be liable to plaintiffs in damages. . . ." *Id.* at 580, 123 P. at 52.

Because there was little relevant American authority, the *Isherwood* court relied heavily upon English cases. We find these cases are analogous.

In *Jeffryes v. Evans*, 19 C.B. (N.S.) 246, 144 Eng.Rep. 781 (C.P. 1865), plaintiff held, through a lease from defendant, the "exclusive shooting, fishing and sporting" privileges over some land, those privileges having been reserved when defendant leased the land to one Rees. The lessee, Rees, "cut all the underwood and grubbed up the furze-covers [spiny shrubs], thus driving away the game, so as almost entirely to destroy the shooting . . . ." *Id.* at 252, 144 Eng.Rep. at 784. Plaintiff sued his lessor for damages. The court found the issue to be whether the reserved and assigned right implied a covenant not to cut down the brush and underwood, so as to deprive the game of natural cover, even though the cutting was done in the ordinary and reasonable cultivation and use of the land. In deciding the case, Erle, C. J., noted, "There has been no eviction. The plaintiff has just as much right to shoot and sport over the . . . land . . . as he had before: and that is all the plaintiff covenanted that he should have." *Id.* at 265, 144 Eng.Rep. at 789. In the same case, Montague Smith, J., stated,

[T]he cutting of the furze and underwood, which may have been done in the ordinary course of good management of the farm, was not an interruption of the enjoyment of the incorporeal hereditament granted to the plaintiff. He had the same right to sport over the land as before. If he wished to have the condition of the land as to furze and underwood preserved, he should have expressly stipulated that the present mode of cultivation of the land should not be altered.

*Id.* at 268, 144 Eng.Rep. at 790.

A similar holding is found in *Boyle v. Holcroft*, [1905] I.R. 245, 249–50 (Ch.Div.), where the court ruled,

The right of fishing must be exercised in view of the occupying tenant's [landowner's] right to use all proper and reasonable means which may be necessary from time to time for the management and cultivation of his farm. . . . [A]s a general rule, so long as the tenant is *bona fide* and reasonably managing and using the lands, the owner of the fishing rights must be content to exercise his right upon the lands in the condition in which they may happen to be from time to time.

In *Fetherstonhaugh v. Hagarty*, 3 L.R.Ir. 150 (Ch. 1878), an exclusive *profit a prendre* (hunting privilege) was reserved to a landowner under a lease. The court held the tenant was not answerable for acts done in the ordinary cultivation of his farm, despite the fact that the game was destroyed as a result.

*Gearns v. Baker*, L.R. 10 Ch. 355 (Ch.App. 1875), applied principles applicable to the resolution of this dispute. *Gearns* involved a suit alleging that a threatened cutting of trees would destroy game cover. Defendant had previously rented to plaintiff the right to shoot, course and fish over his lands for a term of 21 years. In refusing to grant an injunction, Sir W. M. James, L. J., stated,

> It is preposterous to suppose that a man who grants a shooting lease for twenty-one years is to be dictated to by this Court as to whether he shall cut down a tree or remove a coppice [thicket], because by doing so he would be driving away the hares or interfering with the breeding of the pheasants. If men mean to acquire such rights, they must express their meaning clearly. I am of opinion that such rights are not expressed and not implied in the ordinary grant of shooting . . . .

*Id.* at 357. In the same case, Sir G. Mellish, L. J., opined:

> The question is purely legal, whether a landowner, by the mere granting under seal to another person the exclusive right of shooting, coursing, and fishing over 1300 acres of land which still remain in his possession, is prevented from cutting his trees. I am of opinion that he is not, and that on such a grant no action at law for simply cutting his trees would lie against him. . . . [T]here is no evidence that the landowner is not cutting the trees *bona fide* . . . .

*Id.*

Plaintiff does not cite any decision involving analogous facts to support his position.

■ We hold as a matter of law that "recreational rights," when as here so nearly equated with hunting rights, do not limit the landowner in his or her use of the affected land absent an express covenant to the contrary or a malicious bad faith destruction of the clearly designated object (*i. e.*, game or its habitat) of the right. *See* 35 Am.Jur.2d *Fish and Game* § 21 (1967) ("The grantor is not liable for depreciation in the value of such [hunting] rights from his acts in clearing and draining the land, providing he does so in good faith for the purpose of improving it."); 38 C.J.S. *Game* § 4 (1943) ("In the absence of express restrictions the grantor, if he acts in good faith, may do any act of husbandry, although it injures the hunting, but he is liable in damages to the owner of the hunting privilege, if he does such acts in bad faith.").

■ Although we regret in this instance the destruction of a portion of Iowa's limited timberland, we believe the rule we adopt here is preferred in the context of long-term public policy. We judicially note the permissive "open range" concept of hunting and recreational activities on private land is passing from our scene. The future likely will bring hunting and recreational grants obtained by counsel-protected organizations from individual landowners who, under the rule advanced by plaintiff, might not visualize the range of implied restrictions on what would otherwise be appropriate activities on, and uses of, the land. Such recreational activities may be only a potential incidental use of the property. To say such limited purposes should dictate by implication the remaining uses, permitting the tail to wag the dog, would generate unnecessary uncertainties and needless litigation.

The party reserving or obtaining a grant of such rights may reserve or contract for the preservation of present conditions as well. Here plaintiff neglected to do this. In fact, at the time he made the reservation and sold the land he knew it would be subjected to extensive logging. There was no evidence defendant denied him access or denied him the right to carry on any of the activities delineated in the reservation.

■ The cases we rely on, cited above, hold the issue here to be a "purely legal question." *Gearns*, L.R. 10 Ch. at 357. This conforms to our principle that construction of a contract, as distinguished from interpretation, is its legal effect and is always a matter of law to be decided by the court. *Westhoff v. American Interinsurance Exchange*, 250 N.W.2d 404, 408 (Iowa 1977). The issue of existence of a legal duty under a contract is also a matter of law. *Roland A. Wilson & Associates v. Forty-O-Four Grand Corp.*, 246 N.W.2d 922, 924 (Iowa 1976).

■ The issue here was one of law for the trial court, absent any showing defendant acted maliciously and in bad faith in clearing the remaining trees and debris and planting his land to corn. There was no evidence of this. Defendant testified he acquired the land with the intent to plant it to corn. He also testified he told plaintiff he could hunt, fish, or do anything else on the land, and on other land defendant owned. Plaintiff does not dispute this testimony. We find no evidence to justify submitting a bad-faith issue to the jury.

Defendant's motion for directed verdict should have been sustained. We reverse and remand with directions to enter judgment for defendant.

REVERSED AND REMANDED WITH DIRECTIONS.